I didn't get to say thank you very much. It's a pleasure.   I'm going to take a few minutes to prepare. Thank you. Thank you. Thank you. OK. Our last case this morning is Number 19-1430, Solder Manufacturing Company v. J. Squared, Inc. OK, Mr. Jacob. Good morning, Your Honors. My name is Michael Jacob. I'm appearing on behalf of the plaintiff and the appellant in this matter. We bring appeal from the order denying our motion for contempt in the Northern District of Ohio as well as a breach of the settlement agreement. One of the counts is that we claim that the district court erred by allowing UDC to sell its existing inventory of the enjoined shares, which was the Wave 2.1, in anything other than the Fred share configuration. I think the language in the contract of the settlement agreement was quite clear. Paragraph 2 says it shall not sell that share. Let me ask you some hypothetical questions. Sure. Supposing that ULC destroyed each share and sold it for scrap, you don't have any problem, do you? No. That's not a sale. That's not a sale of the enjoined product, in my view. In other words, they scrap it and they just sell for the scrap value of the plastic. Yeah. Well, that's an interesting question. I mean, I don't... Thank you. I guess if they scrap it and give it to a junkyard and they give them a penny a pound, it's a plastic chair, I guess I wouldn't be here because they didn't sell it to a competitor or, you know, a customer of ours. I mean, obviously that subject matter is not covered in the settlement agreement. If they took off the legs and the base of each chair and sold it as a seat on the floor, would that violate the settlement agreement? No, because our client did not object to the convertibility of the Fred share. The settlement was all about the rocker rail. The picture of the Fred chair that's attached to the settlement agreement. Leaving aside your argument about the removability of the studs that are used, how does ULC physically altering the chair so that it's no longer a convertible chair violate the agreement? Because it's all they did... Well, so what you're saying is they altered the enjoined chair by putting a pin into the tread barrel. Is that what you're referring to? Yeah. Okay, so that's the picture that I have here, okay, which is part of the video at appendix 1533, which is exhibit 33, and this is the pin. This is the thread barrel, and they put this pin in here, which disabled one from turning the barrel to separate or decouple the rocker from the stool base because the way the chair works is apparently... I said to you, assuming that can't be removed... This cannot be removed. Right. Okay, the point being is it's still about the rocker rail because they brought the picture of what they proposed to do to the settlement conference, which was exhibit C to the settlement agreement. How does it violate the settlement agreement if they can't use it as a rocker chair? They weren't supposed to use it as a rocker chair. That was the reason we let them not scrap the existing inventory. They had 900 units. We're not saying they can't sell rocking chairs. We're saying the 900 units that you had in your inventory on the date of the settlement, scrap them. And they said, can we take off the rocker rail because that's what it was all about, and here's a picture. And they said, sure, take it. You can still decouple the Fred chair with the four stubby legs and put it on the floor. It won't rock. How did they violate the injunction, which is 2A of the settlement agreement, when they have made this chair so that it's not convertible? Well, because as Mr. Carlson and Mr. Bontrager, they both testified, if you look at the chair, they look like the Wave 2.1. The injunction says you cannot sell the Wave 2.1. That is very clear cut. It looks like it. It says make the convertible chair products, known as if they've made it non-convertible, is it the convertible chair product? Well, that's the whole point you're at. They have disabled a function that's easily removed by the pin. That's a different issue. I'm sorry? Different issue. No. Let's assume, as Judge Wallach said, that it's not convertible anymore, that it's permanent, that it can't be converted. Okay. How do they then violate 2A of the settlement agreement by selling the chair? Because they're selling a chair with a rocker rail, which is part of our design patent, which we got an injunction that they cannot do. No one knows that the chair doesn't decouple until they try to separate the two. It is, Mr. Bontrager testified at length at the evidentiary hearing, that a key factor in him was not the convertibility, but was the ability of this chair to look like our product. And that's the reason I wanted to take the deposition of the University of Virginia, because we don't know that the product actually delivered to them actually had the pin in it. But your problem is that 2A is not framed in terms of what it looks like. It says to make the convertible chair product, known as version 1. If it's not a convertible chair product anymore, it doesn't seem to be within the injunction. Well, then you have to accept, and Judge LaHurry said that the, well, the settlement agreement says you can't sell the Wave 2.1. Now, you take the Wave 2.1 and you put a pin in it so it still looks like the Wave 2.1, you just can't decouple it. Our position is that's not enough. They made the settlement. We're going to cut the rocker rail off. We're going to make four stubby legs. So that's not the Wave 2.1. You can sell your 900 units that way. I mean, how is that any different than if someone bolts a door closed and then sells it to a customer and they unbolt the door and they use it as a patented product? That is our objection here. They weren't supposed to sell the existing inventory with the rocker rail. That's the gut of our case about the injunction. Have you filed a suit for infringement? I'm sorry? Have you filed a suit for infringement? We did initially, but then we made a settlement, so now this is all about— No, no, I'm wondering, because the settlement agreement, you're arguing for us that there's a violation of the settlement agreement. Yes, and the injunction as well. But I think the settlement agreement would allow you to still sue for infringement for anything other than the Fred chair. That's correct. Now, you try to make a settlement to terminate one case, not to have a road map to start another one the next day. I understand, but just looking at what the plain language of the agreement is, it doesn't say that they can't sell modifications other than the Fred chair. It does say that they can't sell the Wave chair, but it doesn't say that they can't sell some other modification. That's correct, but they can't sell the Wave 2.1 chair, and if they just put a different ribbon on it and sell it as something else, they're still violating the injunction in breaching the settlement agreement. Now, you're correct, Judge Stoll. We can start a second patent infringement case. When you contacted the University of Virginia, what did they say? We didn't contact them. We asked the court—discovery was over. We filed a motion for relief from the protective order, the discovery order, asking for leave of court. This is in preparation for the evidentiary hearing.  You have a telephone. They're listed in the phone book. Well, we didn't contact them. We wanted to go take their deposition. We found out about them in May. We had the evidentiary hearing in October, I believe it was. I understand what you're saying. I said we want to go take the deposition. They didn't want us to interfere with their— Why take their deposition if nothing bad has happened? Well, I want to know if they're using the Wave— Why don't you call them and ask them? That's probably a good question, right? It is probably a good question, like my last one. All right. We did not contact them. We chose to take discovery from them. And the discovery we got by the court order was— It seems like a waste—well, it seems like a violation of Rule 1 is what it seems like. I'm sorry? Rule 1 of the Federal Rules of Civil Procedure. Well, I don't have it with me. Oh. I don't understand what you're saying. No, we wanted to take discovery. We initially sought the discovery from ULC. Judge Lurie said you can have the documents. You can't take the deposition. He didn't say we couldn't contact them. We didn't ask for permission to contact them. We didn't want to interfere with their sales contracts either. We didn't want to have that issue facing us by contacting them and bragging their customer into the litigation without first— You were going to depose them? Yes. And you think that's less disruptive? Well, we didn't have an argument. We're appealing his order by not allowing us to take the deposition or get discovery directly from the University of Virginia because we don't know— First of all, if they're selling the Wave 2.1 chair to them as an assembled unit, they have to buy new cartons because these things come knocked down. They have to be assembled. And it's very easy to remove the pin. We saw the video, which is Exhibit 33, I believe. Mr. Bontrager— You've got a fact-finding to the contrary by the district court. I'm sorry? You have a contrary fact-finding by the district court that it's not easy. Correct. I think the district court abused its discretion by not letting us proceed with the discovery against the third-party University of Virginia. As I say, we don't know that the University of Virginia didn't remove the pin and is using the Wave chair. Now, if the University of Virginia removed that pin and they took all those pin chairs and put it into their existing inventory of the Wave chair and all the college dormitories, they got a $250 chair for $99, and they're using the Wave chair because there's no dispute that the pin chair is identical in all respects, both in appearance and in function, to the Wave 2.1, which is subject to the injunction. You know what the Spartans said to Philip of Macedon? If. No, I don't. I don't know what you're thinking. You said if the University of Virginia, and then you went off on this parade of horribles. If. Oh, no. Okay, aside from the sale of the chairs, how do they violate the settlement agreement? They violate the settlement agreement because they're selling in a non-authorized computer. No, no, no. Okay, I'm sorry. Aside from the sale of the chairs, what's the violation of the settlement agreement? With respect to the sale of the chair? No, any violation. Okay, the other issues we bring here is they didn't delete all the images and references on the Internet to all the enjoying chairs. Okay, so the contract of settlement only requires reasonable efforts. What was unreasonable about what they did? Why was it not reasonable? Because they hired a person who it's all outlined in the 20 pages of briefing. They had Mr. Shoemaker just look at his own website. They didn't go to Google. They didn't go to LinkedIn. They didn't go to Twitter. They didn't go to Facebook. No, no, you haven't established that. The record does not establish that. You don't even have any testimony that that's true. Yes, I do. Where? It's in the transcript. Do you have it in the transcript? Where? I've read the transcript. I don't see it. How many images were left up? Four months later, we only found four, I believe it was. But they had 150 days from the date of the settlement agreement to wipe everything off the Internet. How many were taken down? We don't know that number because Mr. Shoemaker couldn't tell us. We asked him to edit his deposition. We asked him to edit trial, I believe, as well. Now, if you look at the notice of first breach. Where is your evidence that they didn't comply with the settlement agreement with respect to third parties? It's in the notice of default, and I can get that for you. No, I want to see the transcript. The notice of default is the evidence of what they did. Where's the testimony that they didn't comply? It is in volume number two. Since you have three volumes of evidence. Yes, this is the transcript of the evidence. It would be Mr. Shoemaker's testimony testifying as to what he did and did not do. It was quite lengthy. But I'm sure you know it. I'm sorry? I'm sure you know it. I don't know the page numbers if that's what you're asking me for. I know it's in the appendix. Yeah, there are three volumes of it. Yes. If you can give me a moment. I believe the evidentiary hearing transcript begins on appendix 496. And Mr. Shoemaker's testimony begins on page. Let's see. Mr. Bontrager went first. There's 1783. This is the testimony of Marciniak. I'm sorry? This is the testimony of Marciniak. He's asked a question. His was admitted by deposition. Okay, it's a deposition. All right. So he testifies as to what he did. My question is, did somebody contact Sam's Club to delete the availability of the item? My presumption would be yes. I didn't follow up with that. And he says that Collins would have. There's no testimony that Collins didn't follow up. What? I'm sorry, I didn't hear you. There's no testimony that Collins didn't follow up with third parties. There's no testimony that they didn't contact the third parties. The only testimony is from this guy. He says, I presume they did follow up with third parties. Well, Mr. Schumacher, if I could just find his section. I've outlined it in our brief with citations to the specific paper. Well, maybe you can find it on the reply. I'm sorry? Find it on your rebuttal. Okay. I will do that while Mr. We'll give you two minutes for rebuttal. Mr. DeVos. Yes, thank you. Good morning, your honors. May it please the court. My name is Tom DeVos. I represent University Loft Company. I request reserve one minute for the cross-appeal on attorney's fees. Okay. So, as we've already discussed here, the issue basically revolves around the sale of this pin chair in this case. And the settlement agreement only covers enjoined chairs. And the definition of enjoined chair is a convertible chair that qualifies as one of four enumerated versions. In other words, if it's a different version that's convertible, it's not covered by the settlement agreement. If it's a non-convertible chair, it's not covered by the settlement agreement. And the court correctly found, as a matter of fact, the pin chair does not qualify as a convertible chair. That it is a fixed chair. And that's what the facts established. And we're not here to relitigate that issue today, or we shouldn't be here to relitigate that issue today. Did both parties prevail? No, both parties did not prevail. This is a contract provision that says the prevailing party shall be entitled to their attorney's fees. It's not a statutory provision. It's not something that says may in the court's discretion. It's something that was bargained for by two commercial entities that have equal bargaining power. And it says the prevailing party gets their attorney's fees. And the court concluded that University Loft, in good faith, complied with the agreement in full. And as a result, it was the prevailing party. And there is no dispute about that. There's no factual dispute about that. You say as a result the court found it was the prevailing party? No, the court found that there wasn't a prevailing party. And its reasoning was that both parties are prevailing in the sense that the loss is over. Well, that's not, that of course completely subverts the idea of a prevailing party. What is the standard for a prevailing party in Ohio? I believe our brief says that it's abuse of discretion. No, no. I mean, what is, how do you know which party prevailed under Ohio law? The cases say that, the cases say that we cited, I believe say that. You both say Nottingdale. And if you win the majority of the case, if you win the core part of the case, then you should be the prevailing party. But we won the entire case. So it doesn't, I'm not even sure it really matters what the standard is in terms of whether you win 10 percent or 80 percent, 70 percent, or 55 percent. We won 100 percent. Even where there's an attorney's fees provision, trial judge has a lot of discretion because they're right there Johnny on the spot. And they're able to look at both parties. And at least sometimes that trial judge says to herself, you know, a plague on both your houses. Go away. Well, this may be it. And don't they have inherent authority to do that, having been a trial judge for 16 years? Understood. But in this case, it actually was a provision in the contract that the parties agreed to. And I would acknowledge that if there were some gray here in terms of who prevailed or who didn't, or some of the claims were broad and there was not, didn't prevail on all of them. But in this particular case, University Law prevailed on every claim. And so I don't think there's any room to say that the judge, unless you're going to say the judge retains discretion without having to reference any facts, or it retains discretion apart from the parties have agreed, the prevailing party wins their fees, but the judge can just decide without any reference to fact, but can just decide that I'm not going to award those fees. I would say that is maybe the one instance where you go beyond somebody's discretion. You're abusing your discretion. Ours is the situation where there really is no room for saying both sides prevailed. In most cases, there are. In most cases, there's an ability to hang your hat, your abuse of discretion hat, on some factor of the case. I mean, the trial judge was sub salientio saying you were lucky to get away with it. Well, if that's the case, that's conjecture. Because the court said that the University Law, in good faith, complied with the agreement. And this was in the face of allegations of deliberate willful, I mean, some pretty hyperbolic types of allegations. And the judge came to the exact opposite conclusion. The judge said, there's no deliberate violations here. There's no willful misconduct here. In fact, there's good faith conduct here. They did everything they were supposed to do under this agreement, and yet they're dragged to this forum again and up here on appeal. And so in that situation, I do think attorneys' fees are warranted, and I think the judge's decision that both parties prevailed in the sense the lawsuit is over really is not a standard. Because that's true in every instance. When any case ends, the case is over. I'll say this. I think you can make that argument in good faith. I do. I'd probably make it if I was you. But I want to address a couple points made by opposing counsel, Sauter's counsel, in terms of the pin chair. They said, you know, picture. Well, the picture they present is half the picture, okay? The picture of the tray chair, which is Sauter's chair, and University Law's convertible chair, the wave chair. There's really two pictures. There's the picture of the office chair, and then there's the picture of the chair in its detached form, which is really what this case is all about, is about a chair that is detachable. If it's just an office chair, even if it's got rocker rails on it that don't function, that's not this case, okay? This case involves convertibility. That's what the patent is about. That's what the dispute was about. And the picture, the picture would be a picture of both in its assembled configuration and its detached configuration. That's the picture, okay? And so the picture of the pin chair did not in any respect represent or look like the Sauter chair, when you take the full picture into account. On the issue of the fixed chair and discovery, the court found that University Law, in all of its communications with customers, that it was represented as a fixed chair and its intent was to sell it as a fixed chair. There was no evidence that anybody was removing or intended to remove the pins or even could or knew how to remove the pins. The judge ordered the request for discovery from the University of Virginia came very late, after discovery had already occurred and after mediation. And the court rightfully found that, look, these are two competitors. Getting a customer involved in terms of formal discovery is an issue. And then also said, well, University Law, we're going to make you produce every communication you have with your customers on this issue. And we did. And there's no allegation to the contrary. And the court said through those communications, Sauter can determine whether they think this is a farce or not. And clearly it was not a farce. So in that respect, again, there was full compliance. And there is no need to reverse on the discovery issue. In terms of the removal of the images, again, Sauter's allegations all through the case and even in its appellate brief was that we did nothing. I mean, they literally say we did nothing to remove these images. And that's just not supported by the facts at all. And they hired an outside entity to remove these. The entity spent hours and hours and hours doing it, went word searches page by page, 450 pages on the website, 600 pages on the blogs, going through blog entries from five years ago, page by page, looking for references to the enjoined shares and removing them. And then Sauter did its own investigation before the 150 days was up. 17 hours, 17 and a half hours, the CEO of Sauter spent a lot of time, 17 hours, trying to figure out if he could find additional images. And he found some. And he presented it to University Law. It was an exhaustive list. It was his list. And they removed all those within seven days. The agreement has a seven-day cure period, no violation of the agreement. But they didn't stop there. That should have ended the case. We shouldn't be here, right? That's what the original complaint was about. I agree with that. We shouldn't be here. And then they went out and spent dozens of more hours trying to find additional images, going through a side door in University Law, basically into its upload directory. And the issue of the modified share, that didn't even come until later, until they'd done discovery. And actually, University Law, actually, Judge Zuhari said, if University Law had brought it to their attention, maybe it could have been resolved. I actually brought it to their attention in our response to their notice, their first notice, and said, please understand, avoid any misunderstanding, here's what we're going to do with this share. We're going to insert this pin and disable it. So they worked on it. What's that in the record? It is in the record. Yeah. Where is it? It is. I didn't notice that. Yeah, so in University Law's response to Sauder's first notice, I believe it is at Apex 1590 and 91. And in that response, there is a paragraph that says, please understand, avoid any misunderstandings, we're going to make this a fixed share. At that point, there hadn't been any sale to the University of Virginia or University of Dayton, which is basically where this inventory went. You know, another point to be made is sort of the academic nature of this, and that is there was no allegation of lost sales here or harm in terms of lost sales by Sauder. The inventory is gone. It was sold long ago. And so this is kind of an academic argument about whether the pin share violates something or not, because they didn't suffer any harm as a result. So that basically, I would say, you know, after University Loft had removed the images, Sauder agreed that those images had been removed and then went out and tried to find additional ones. At that point, University Loft had satisfied its reasonable steps, reasonable efforts to remove the images, and that's what Judge Zuhauri found. And there are certainly sufficient facts to support that. So that is, I believe I've already discussed the issue on the cross-appeal, and I think I guess I would close my side with sort of this point. I think this case to me represents a situation where Sauder sort of engaged in this relentless effort to find any kind of breach they could, regardless of the facts. They were going to find a breach, and they were going to pursue this no matter what. They were going to try to. And so they sent this letter, this first notice, after the 150 days. It said a sale was pending, which wasn't. They had actually tried to make that sale, and it was not pending. It had been canceled the same day that they made that. It was through some entity called Rock Buy that University Loft had never heard of on Amazon, and yet it wound up in their first notice that there was this pending sale, which there wasn't. And then it made a reference to these images that hadn't been, it made a reference to Sam's Club. The picture on there was years old and said it was out of stock and was not available. And then it made a reference to these images that were, that they had found through 17 hours of looking on the Internet, and those were promptly removed. That should have solved this case, and that should have been the end of this case. But they asked for discovery over our objection. The court granted it, and there was extensive discovery engaged in. There was requests for admissions, document production, interrogatories, depositions. I mean, the whole gamut was engaged in, and we had to go through that and incur fees to respond to this, even though we knew there was no basis for this lawsuit. And so then the second notice came as a result of the discovery that shouldn't have been had in the first place. And this, I think, relates to the fees. We spent a lot of money defending this case, and there really was no basis for pursuing this in the first place. And no matter what the facts said, the allegations continued to be deliberate, willful, outrageous behavior by University Law. And the court just said, that's just not true. I'm just going to reject that. I'll give you this. I practiced law for a while, too, and there were points at which a client would say, I want to do this, and I'd say to him, you can do that, but I'm not going to do it because a lawyer is the safety on the weapon of the law. That's what rule of law is about. So I'll give you that much. Well, and I think the governor on that behavior, too, is the attorney's fees provision. Right? So if you're going to pursue a claim like that and you lose, you have to pay the fees for pursuing that claim. Yeah, the court didn't find Rule 11, but the court made its final. And I think that, again, I think that that was an abuse of discretion, particularly because— Did you bring a Rule 11 up? What's that? Did you bring a Rule 11 up? No. Midwestern lawyers. So that's our case. Any questions? I reserve my one minute. Okay. Thank you. Mr. Jacob? To respond to Judge Wallach's request, the testimony from Brad Shoemaker with references to the appendix are found on pages 41 to 42 of our first brief, and pages 9 through 13 of our reply brief. Where is the testimony? The appendix. But the reference is to the transcript page. Where in the appendix is the testimony? Okay, I can read all the appendix pages? No, I don't. Just tell me. Okay. Give us the best page you've got. It's appendix 606 to 608 page. 609. 606? Okay. Where does it say? I thought you just wanted to where I had a list of the pages. No. Okay, I'm sorry. We asked you for an appendix, Counsel. Okay. 606 to 608. And 609. Where does he say the third parties were not notified? He did not use any search engines, for example, Google or Bing, to access the ULC website directly or indirectly. That's at appendix 609 and 610. He admitted there was still public access to the images and blogs at appendix 598. That's not the same thing. The question is, where does he say? Who is this guy, first of all? He is the outside IT person that was hired. Okay, so where does he say no third parties were notified? Let me think. Mr. Marciniak said that, and I can show you that's in his deposition. Some third parties were not hired or contacted. I showed you the testimony earlier where he said I presume they were notified. I'm sorry. I can't hear you, Judge. I pointed you to his testimony earlier where he said I presume they were notified. He didn't say they weren't notified. He also goes on in his testimony to say the ones he did not contact, there was one specific he said he didn't contact because they didn't have the credentials. He says it was Mr. Collins' job to contact them. Mr. Who? Collins. I don't know. Never mind. It was Mr. Marciniak and it was Mr. Shoemaker. Let's turn to the attorney's fees. Why in the light of this specific contract provision are they not entitled to their attorney's fees? Well, because they didn't do it timely and they only did it after. What was untimely about it? Well, all throughout our brief we have references to what they did do during the first 150 days and what they did not do. No, no. There's an attorney's fees provision in the contract. Yes. It says that if there's a suit under that contract, the prevailing party gets their attorney's fees. What's untimely about their request to the court after? There's nothing untimely about their request. Okay. Then you answer the question. So why shouldn't they have their fees? Because they are not, in my opinion, the prevailing party because they didn't comply with it. The judge is in a hurry. In his opinion, he even noted images still remain. But by June of 2018, after we sent two notices of default and listing off the images that still remain, they then responded to our notices and took them off. And they ignore in that argument that it's their affirmative obligation to go out and do it. The judge did not rule for you on any of the issues that you raised. How can you say that they are not the prevailing party? Because they didn't prevail on every issue they brought before the court. They only prevailed in part. And the judge is recent. What is it they didn't prevail on? Well, they got our petition dismissed. So if that is a full – my understanding of the law is you can prevail in part and not – you can still win a case and not prevail on every issue. Let me ask you the opposite. Sure. On what did you prevail? We didn't. We didn't ask for attorney fees. We put our attorney fees in because it was part of our prayer of relief, but we didn't file – there was no post-filing motions on them. On what? Attorney fees. And you did not prevail on them? No. But we didn't have a separate motion for it. I asked you on what you prevailed, and you've said nothing. Okay. Okay. Okay. Thank you. Well, there's one other comment I'd like to make. No? No. All right. Mr. DeVos. Okay. Thank both counsel. The case is submitted. That concludes our session for this morning.